Filed 5/17/12 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2012 ND 102

Cecil H. Bell, Petitioner and Appellant

v.

North Dakota Department 

of Transportation, Respondent and Appellee

No. 20110201

Appeal from the District Court of Grand Forks County, Northeast Central Judicial District, the Honorable Lawrence E. Jahnke, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Henry H. Howe (argued), 421 DeMers Avenue, Grand Forks, ND 58201, for petitioner and appellant.

Michael Trent Pitcher (argued), Assistant Attorney General, Office of Attorney General, 500 North 9th Street, Bismarck, ND 58501-4509, for respondent and appellee.

Bell v. ND Dept. of Transportation

No. 20110201

Crothers, Justice.

[¶1] Cecil H. Bell appeals a district court judgment affirming a North Dakota Department of Transportation decision revoking his driving privileges for one year.  Bell argues he was denied his statutory right to consult with an attorney before deciding whether to submit to a chemical test.  We affirm.

I

[¶2] On October 2, 2010, at approximately 6:27 p.m., North Dakota Highway Patrol Officer Dolf Oldenburg initiated a traffic stop after observing a motor home driven by Bell cross the fog line several times.  Upon making contact with Bell, Oldenburg detected a strong odor of alcohol and observed Bell’s eyes were glassy and his speech was slurred.  At Oldenburg’s request, Bell exited the motor home and got into the front passenger seat of Oldenburg’s patrol vehicle.  Oldenburg radioed North Dakota Highway Patrol Officer Adam Dvorak for assistance.

[¶3] At approximately 6:34 p.m., Dvorak arrived at the scene and took over the investigation.  Dvorak moved Bell to his patrol vehicle, a sport utility vehicle with a police dog in the cargo area.  Dvorak placed Bell in the front seat, and Bell agreed to perform the alphabet, backward count, finger count and horizontal gaze nystagmus tests.  After administering the tests, Dvorak read Bell the onsite screening implied consent advisory and asked Bell to submit to the S-D5 onsite screening test.  Bell refused to submit to the S-D5 but agreed to perform standardized field sobriety tests outside the patrol vehicle.  Dvorak attempted to administer the one-leg-stand test, but Bell would not follow his instructions.  At approximately 7:27 p.m., Dvorak arrested Bell for driving under the influence (“DUI”), handcuffed Bell and placed Bell in the back seat of his patrol vehicle.  Dvorak and Oldenburg began securing Bell’s motor home.

[¶4] At approximately 7:52 p.m., North Dakota Highway Patrol Officer Quentin McCart arrived at the scene.  McCart sat in Dvorak’s vehicle with Bell while Oldenburg and Dvorak finished securing the motor home.  Dvorak returned to his patrol vehicle.  Bell complained about the dog in Dvorak’s vehicle, and Dvorak moved Bell to the back seat of McCart’s patrol vehicle.

[¶5] At approximately 7:58 p.m., McCart left the scene to transport Bell to the Grand Forks County Correctional Center.  During transport, McCart stopped to adjust Bell’s handcuffs.  McCart then continued the transport and at approximately 8:06 p.m., read Bell the chemical test implied consent advisory.  Bell interrupted McCart repeatedly.  McCart asked Bell to submit to an Intoxilyzer 8000 breath test.  Bell did not affirmatively consent or refuse.

[¶6] When McCart and Bell arrived at the Correctional Center, Bell stated he would not submit to an Intoxilyzer test until he consulted an attorney.  At approximately 8:09 p.m., Bell was moved inside the Correctional Center and given a telephone and a telephone book.  Before making any calls, Bell asked for a glass of water.  At approximately 8:23 p.m., Bell called a friend.  Bell told the officers his friend was bringing an attorney to the Correctional Center.  Dvorak asked if Bell would submit to the Intoxilyzer test.  Bell stated he would not take the test before talking to an attorney.  At 8:27 p.m., when the two-hour period for conducting the chemical test expired, Dvorak issued a Report and Notice, indicating Bell had refused to submit to the onsite screening test and the Intoxilyzer test.

[¶7] Bell requested an administrative hearing.  The hearing officer made detailed findings regarding Bell’s behavior following the traffic stop and stated, “Mr. Bell’s behavior at the scene of the traffic stop, during transport and at the correctional center could reasonably be interpreted as intended to delay the investigation.”  The hearing officer found Bell refused to submit to the onsite screening test and the Intoxilyzer test and revoked Bell’s driving privileges for one year.  Bell appealed to the district court.  The district court affirmed.

II

[¶8] We exercise limited review of the administrative revocation of driving privileges under the Administrative Agencies Practice Act, N.D.C.C. ch. 28-32.  
Wetzel v. N.D. Dep’t of Transp.
, 2001 ND 35, ¶ 9, 622 N.W.2d 180.  Our standard of review is the same standard applied by the district court.  N.D.C.C. § 28-32-49.  We must affirm the administrative agency’s decision unless:

“1. The order is not in accordance with the law.

“2. The order is in violation of the constitutional rights of the appellant. 

“3. The provisions of this chapter have not been complied with in the proceedings before the agency. 

“4. The rules or procedure of the agency have not afforded the appellant a fair hearing. 

“5. The findings of fact made by the agency are not supported by a preponderance of the evidence. 

“6. The conclusions of law and order of the agency are not supported by its findings of fact. 

“7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant. 

“8. The conclusions of law and order of the agency do not sufficiently explain the agency’s rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.”

N.D.C.C. § 28-32-46.

III

[¶9] Bell argues two of the hearing officer’s factual findings were not supported by a preponderance of the evidence.  The State responds the hearing officer’s findings were supported by the weight of the evidence.  To determine whether an administrative agency’s findings of fact are supported by a preponderance of the evidence, “we do not substitute our own judgment for that of the agency, but instead determine whether a reasonable mind could have determined that the factual conclusions were proven by the weight of the evidence presented.”  
Wetzel
, 2001 ND 35, ¶ 9, 622 N.W.2d 180.

A

[¶10] Bell argues the hearing officer’s finding that Bell’s behavior was intended to delay the investigation was not supported by the evidence presented at the administrative hearing.  At the hearing, Oldenburg, Dvorak and McCart gave detailed accounts of Bell’s behavior during the  investigation.  Dvorak testified that when he took over the investigation, Bell was “talking in circles” and that he spoke with Bell for approximately thirteen minutes before asking Bell to perform field sobriety tests in the patrol vehicle.  Dvorak described Bell as “reluctant” to perform the tests and explained, “I would just try to redirect the conversation back toward my investigation versus . . . he would redirect the conversation toward personal problems, and I would just try . . . we just kind of would go around and round[.]”  Dvorak testified that after Bell performed the in-car tests, he asked Bell to submit to the onsite screening test and Bell continued to try to redirect the conversation:

“I went um . . . we talked about the situation, about the preliminary breath test.  He kept saying that he didn’t want to take it.  He would . . . we would continue to go around in circles about . . . he would say, well, I’m having a problem ‘cause of your dog, your canine.  I said, well, would you like to go sit up with . . . with Sgt. Oldenburg?  He would say no.  We’d go back to nervousness.  We’d go back to the problem with his fiancée; it just would go round and round and round.”

Dvorak testified Bell stated he would not submit to the preliminary breath test but agreed to perform additional field sobriety tests.  Dvorak testified Bell then refused to follow his instructions:

“We went outside of the vehicle, and I began the instructions for the one-leg-stand test, and Mr. Bell would . . . anytime I’d try to explain the test, Mr. Bell would . . . go round and round in a circle type of conversation again, where we weren’t getting anywhere.  I would . . . advise him to just relax, I’ll tell you how to do the test, and when I started telling him about, you know, to . . . to perform the test, you need to lift your foot six inches off the ground, and he said, well, how do I know what six inches is.  I said, well, it’s half a foot.  Mr. Bell, then, basically, implied that I was trying to trick him by the measurement of six inches, and I just was done.  I didn’t want to even try anymore because it was just too hard.”

Dvorak testified that after attempting to administer the test, he arrested Bell for DUI and placed Bell in the back seat of his patrol vehicle.

[¶11] Dvorak testified he and Oldenburg then secured Bell’s motor home.  Oldenburg testified two dogs were inside the motor home.  Oldenburg testified that he asked Bell what he would like done with the dogs and that Bell “wasn’t uncooperative, but he really gave us no directions to what he would like done with the either the vehicle or the two dogs.”  Oldenburg testified that after presenting Bell with his options several times, the officers decided to let the dogs out before returning them to the motor home, locking the motor home and leaving it on the side of the road.  Dvorak testified after the motor home was secured, he returned to his patrol vehicle.  Dvorak testified Bell complained the police dog was frightening him.  Dvorak testified he asked Bell if he wanted to be transported in another vehicle, Bell responded he “want[ed] his rights observed” and Dvorak transferred Bell to McCart’s patrol vehicle.

[¶12] McCart testified that he got into his vehicle and left the scene immediately after Bell was moved to his patrol vehicle and that Dvorak followed in his patrol vehicle.  McCart testified that during transport, Bell complained of pain from the handcuffs and cried for help.  McCart testified he stopped to adjust Bell’s handcuffs and Dvorak stopped to assist.  McCart described Bell’s behavior during the stop:

“He was a little um . . . little not non-cooperative in a sense of fighting, but non-cooperative in a sense of once you got him out, then he didn’t want to give me his hands to move them to the front, he just wanted to turn around and look and talk to me, and . . . you know, I kind had to tell him if you come out of this car, you’d better listen.  And he was like, well, you know, he said . . . you know, I’m not a bad person . . . .  But, then he just wouldn’t give me the hands.  He kept turning to the left, turning the right.  So I had to forcefully grab his hands, undo the handcuff, and then forcefully put him in the front, but I mean, he wasn’t really fighting as much as he was just kind of distracted is what I would say.  He just kind of wanted to do other things, other than actually pay attention to what he was asking there for assistance in.”

McCart testified once Bell was back in his vehicle, he proceeded to transport Bell to the Correctional Center.  McCart testified he read Bell the implied consent advisory during transport and Bell interrupted him several times.  McCart testified when they arrived at the Correctional Center, he transferred Bell to the booking area and gave Bell a telephone book.

[¶13] Bell argues the finding his behavior was intended to delay the investigation was not supported because it was contrary to Oldenburg’s testimony that Bell was not uncooperative and none of the testimony “indicate[d] that Bell was belligerent, rude, or obnoxious—or that he swore at the police or presented any physical threat or resistance in any form or manner to the police action during the two hour period following the stop.”  While Bell’s assertions may be correct, we conclude that based on the testimony regarding Bell’s continued attempts to change the focus of the investigation, his refusal to follow instructions and his complaints about being uncomfortable in the officers’ patrol vehicles, a reasonable mind could have determined Bell was trying to delay the investigation.

B

[¶14] Bell argues the hearing officer’s finding that Bell was given a telephone and a telephone book at approximately 8:09 p.m. was not supported by the evidence.  Bell argues 8:09 p.m. was the time the officers and Bell arrived at the Correctional Center.  At the administrative hearing, McCart and Dvorak testified about what happened after Bell was transported to the Correctional Center.

[¶15] McCart did not testify as to when they arrived at the Correctional Center, but testified that upon arrival, he pulled into the sally port and “immediately” transferred Bell to the booking area.  McCart testified he then gave Bell a telephone book and left the Correctional Center a short time later.  McCart testified Bell did not make any calls while he was present and stated he did not know if Bell ever attempted to contact an attorney:

“I would get him the phone book.  He’d want a lawyer, and then he would say, I want a drink of water.  I’m like, well, you need to use the phone book right now, and then it was like, well, I want a drink of water . . . I want . . . so.  I  mean, he did have a phone book, though, and I never knew what happened after that.”

[¶16] Dvorak testified that he, McCart and Bell arrived at the Correctional Center at 8:09 p.m.  Dvorak testified Bell then was transferred to the booking area where he was provided with a telephone and a telephone book.  Dvorak testified Bell stated he could not read the telephone book and asked for his cell phone.  Dvorak testified Bell was given his cell phone, looked up a number in his cell phone and then used the Correctional Center phone to call a friend at approximately 8:23 p.m.  Dvorak testified Bell stated his friend was bringing an attorney to the Correctional Center.  Dvorak testified he asked Bell to submit to the Intoxilyzer test and Bell stated he wanted an attorney.  Dvorak testified he issued Bell a Report and Notice at 8:27 p.m.

[¶17] Based on Dvorak’s testimony that Bell arrived at the Correctional Center at 8:09 p.m. and McCart’s testimony that Bell was “immediately” transferred to the booking area where he was given a telephone and a telephone book, a reasonable mind could have determined Bell was provided with a telephone and a telephone book at 
approximately
 8:09 p.m.

IV

[¶18] Bell argues the hearing officer’s order was not in accordance with the law because Bell was denied his statutory right to contact an attorney before deciding whether to submit to a chemical test.  The State responds Bell had a reasonable opportunity to contact an attorney.

[¶19] In 
Kuntz v. State Highway Commissioner
, 405 N.W.2d 285, 290 (N.D. 1987), we held that under N.D.C.C. § 29-05-20, a person arrested for driving under the influence who asks to consult with an attorney before deciding to take a chemical test “must be given a reasonable opportunity to do so if it does not materially interfere with the administration of the test.”  This statutory right to counsel “is a qualified right which cannot be used to materially hamper the process of administering the chemical test under Chapter 39-20, N.D.C.C.”  
Kuntz
, at 290.  Failure to allow an arrested person a reasonable opportunity to contact an attorney prevents revocation of the person’s driving privileges for refusing to submit to testing.  
Id.

[¶20] “There are no bright line rules for determining whether a ‘reasonable opportunity’ to consult with an attorney has been afforded; rather, the determination of whether a reasonable opportunity has been provided turns on an objective review of the totality of the circumstances.”  
Lies v. Dir., N.D. Dep’t of Transp.
, 2008 ND 30, ¶ 10, 744 N.W.2d 783.  “Whether a person has been afforded a reasonable opportunity to consult with an attorney is a mixed question of law and fact.”  
Wetzel
, 2001 ND 35, ¶ 10, 622 N.W.2d 180.  We give great deference to an administrative agency’s findings of fact.  
Id.
 at ¶ 9.  As stated above, “we do not substitute our own judgment for that of the agency, but instead determine whether a reasonable mind could have determined that the factual conclusions were proven by the weight of the evidence presented.”  
Id.
  Once the facts are established, their significance is a question of law.  
Id.
 at ¶ 10.  We review questions of law de novo.  
Id.

[¶21] Bell argues he was not given a reasonable amount of time to contact an attorney.  Our implied consent laws require a chemical test for intoxication to be administered within two hours after an individual was driving or in actual physical control of a vehicle.  
See
 N.D.C.C. §§ 39-20-03.1, 39-20-04.1(1).  In this case, that two-hour period ended at 8:27 p.m.  Bell received a telephone and a telephone book at approximately 8:09 p.m., less than twenty minutes before the deadline for administering the Intoxilyzer test.  While Bell had a relatively short time to contact an attorney, the hearing officer found the delay was attributable to Bell’s behavior during the investigation.  As discussed above, that finding was supported by a preponderance of the evidence.  Further, when Bell was given the opportunity to contact an attorney, he waited over ten minutes before making a call.  Then, rather than calling an attorney, Bell called a friend.  Under these circumstances, we conclude Bell was given a reasonable amount of time to contact an attorney.  We note, however, that a DUI arrestee generally should not be held at the scene of a stop until the two-hour period has nearly expired and caution that law enforcement must not prolong a DUI investigation or delay giving an implied consent advisory to limit an arrestee’s time to contact an attorney.

[¶22] Bell also suggests even if he was responsible for the delay, he was not given a reasonable opportunity to contact an attorney because the officers did not inform Bell the Intoxilyzer test needed to be administered within two hours of the stop.  We considered a similar argument in 
Boyce v. Backes
, 488 N.W.2d 45, 47 (N.D. 1992), where an appellant recorded as refusing a chemical test before the two-hour period expired asserted “the officer should have told him at the outset the exact amount of time that he had to contact his attorney.”  Recognizing that “[c]ircumstances will vary,” we stated, “There is no rule that a police officer notify an accused about how long he may have to contact an attorney.”  
Id.
  Although Bell was recorded as refusing the Intoxilyzer test at the expiration of the two-hour period rather than before, the same reasoning applies here.  Because circumstances will vary, we decline to require law enforcement to inform a DUI arrestee when the two-hour period for chemical testing will expire.  The standard we apply is reasonableness under the totality of the circumstances.  Under that standard, Bell had a reasonable opportunity to contact an attorney.

V

[¶23] Bell argues the officers’ failure to give Bell a 
Miranda
 warning before providing the implied consent advisory “constitute[d] a critical error in the process established for providing an opportunity to consult with counsel.”  Bell correctly recognizes that part of this Court’s rationale for recognizing the limited statutory right to consult with an attorney was to alleviate the “strange circumstances” resulting when a 
Miranda
 warning assuring an individual’s right to an attorney was given before an implied consent advisory requiring the individual to consent to or refuse testing without an attorney’s advice.  
City of Mandan v. Leno
, 2000 ND 184, ¶ 12, 618 N.W.2d 161 (citing 
Kuntz
, 405 N.W.2d at 287-88).  However, that rationale does not require law enforcement to provide 
Miranda
 warnings before giving the implied consent advisory.  While the officers’ failure to Mirandize Bell may be relevant to the admissibility of any statements made when Bell was subject to custodial interrogation, it is not relevant to the question of whether, after stating he wanted a lawyer, Bell was given a reasonable opportunity to contact an attorney.  
See
 
State v. Haibeck
, 2004 ND 163, ¶ 24, 685 N.W.2d 512 (citing 
Miranda v. Arizona
, 384 U.S. 436, 444  (1966)).

VI

[¶24] We affirm the district court judgment.

[¶25] Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

I concur in the result.

Dale V. Sandstrom